Marlee Goska (Alaska Bar No. 2305043)
Rebecca Noblin (Alaska Bar No. 0611080)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
(907) 350-4822
mgoska@biologicaldiversity.org
rnoblin@biologicaldiversity.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF HOOPER BAY, NATIVE VILLAGE OF PAIMIUT, CHEVAK NATIVE VILLAGE, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *Plaintiffs*, <br> v. <br><br> DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, U.S. DEPARTMENT OF THE INTERIOR, KEVIN PENDERGAST, in his official capacity as Alaska State Director of the U.S. Bureau of Land Management, U.S. BUREAU OF LAND MANAGEMENT, SARA BOARIO, in her official capacity as Alaska Regional Director of the U.S. Fish and Wildlife Service, U.S. FISH AND WILDLIFE SERVICE, and KING COVE CORPORATION, <br><br> *Defendants*. | Case No. 3:25-cv-00316 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101–3233;
National Environmental Policy Act, 42 U.S.C. §§ 4321–4347; Endangered Species Act,
16 U.S.C. §§ 1531–1544; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

# INTRODUCTION

1.      Plaintiffs Native Village of Hooper Bay, Native Village of Paimiut, Chevak Native Village, and Center for Biological Diversity challenge the decision of Federal Defendants Secretary of the Interior Doug Burgum (Secretary), the U.S. Department of the Interior, and the U.S. Fish and Wildlife Service (Service) to enter into an unlawful land exchange agreement with the King Cove Corporation (KCC) to facilitate a road through the Izembek National Wildlife Refuge (Izembek Refuge).

2.      The Secretary announced on October 23, 2025, that he had entered into a land exchange agreement (Exchange Agreement) to trade away approximately 490 acres of federal public lands, 484 of which are in the Izembek Refuge, for approximately 1,739 acres of KCC surface lands within the boundaries of the Izembek Refuge. The stated purpose of the Exchange Agreement is to facilitate the construction of a road between the communities of King Cove and Cold Bay through the Izembek Refuge.

3.      The Izembek Refuge is located at the end of the Alaska Peninsula, between the Bering Sea and the Gulf of Alaska, and contains one of the most productive ecosystems in the world. The Izembek Refuge's lagoons host extensive tidal marshes and eelgrass beds that provide the foundational habitat structure for a rich and diverse array of invertebrates, fish, birds, and mammals. The Izembek Refuge is a globally important staging, feeding, and wintering habitat for migratory birds, including valuable subsistence species such as black brant, emperor geese, and cackling geese. It also contains habitat for Endangered Species Act (ESA)-listed species such as Steller's eiders and northern sea

otters. In the spring, after feeding in the Izembek Refuge, black brant and emperor geese continue their northern migration to the Yukon-Kuskokwim Delta. There, they are harvested by Alaska Native communities, including citizens of Native Village of Hooper Bay, Native Village of Paimiut, and Chevak Native Village (collectively Native Villages). This harvest is a crucial component of subsistence culture and traditional practices, and the birds provide an essential source of nutrition and nourishment. In the fall these communities harvest black brant, emperor geese, and cackling geese before the birds make their way back to the Izembek Refuge.

4.    Because these migratory bird populations are so reliant on the Izembek Refuge's world-class eelgrass habitat, the Service has determined that a road and associated activities in the heart of the Izembek Refuge could cause population-level impacts to migratory birds, including black brant and emperor geese. The proposed road will cause a significant increase in activities that disturb and harm these birds and their habitat, reducing population numbers. For the same reasons, the proposed road will adversely affect ESA-listed Steller's eiders and northern sea otters.

5.    Federal Defendants' decision to enter the Exchange Agreement is legally deficient in multiple respects. First, the Exchange Agreement and associated decision documents attempt to re-write the Alaska National Interest Lands Conservation Act (ANILCA). Congress enacted ANILCA for dual purposes: protecting and preserving the subsistence lifestyle of Alaska Native residents and protecting and preserving lands and wildlife. 16 U.S.C. § 3101(b)–(c). Congress devoted an entire chapter of ANILCA, Title

VIII, to ensuring that subsistence values were protected in perpetuity, explicitly recognizing that subsistence is "essential to the Native physical, economic, traditional, and cultural existence," *id*. § 3111(1), and declaring that the "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands," *id.* § 3112(1).

6.     In entering the Exchange Agreement for the purposes of facilitating a road, Federal Defendants failed to meet the procedural and substantive legal requirements of ANILCA section 810, 16 U.S.C. § 3120, to evaluate and eliminate or minimize adverse impacts to the subsistence resources of Native Villages. Furthermore, Federal Defendants did not comply with ANILCA Title XI, which provides the sole authority for authorizing a road through a refuge in Alaska. *Id.* §§ 3161–73. Instead, Federal Defendants incorrectly claim that ANILCA section 1302(h), *id.* § 3192(h), provides the legal authority for the Exchange Agreement. Even if section 1302(h) could be used to facilitate a road, which it cannot, Federal Defendants have not shown that the Exchange Agreement furthers the purposes of ANILCA, as section 1302(h) requires. Additionally, Federal Defendants did not undertake an analysis of the environmental impacts of the Exchange Agreement as required by the National Environmental Policy Act (NEPA). 42 U.S.C. §§ 4321–4370m. The Service also issued a biological opinion that fails to meet the consultation requirements of section 7 of the ESA. 16 U.S.C. §§ 1531–1544.

7.     Federal Defendants entered the Exchange Agreement without complying with ANILCA, NEPA, or the Administrative Procedure Act (APA), 5 U.S.C. § 706(2),

rendering their decision and the Exchange Agreement arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. *Id.* And the Service issued a biological opinion without complying with the ESA, rendering its biological opinion arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. *Id.*

8.     Accordingly, Plaintiffs respectfully request that this Court declare unlawful and vacate: (1) the Exchange Agreement, decision document, and any appraisals, patents, and warranty deeds that implement Federal Defendants' exchange of Izembek Refuge lands for KCC lands; (2) the final ANILCA section 810 analysis; and (3) the biological opinion. Plaintiffs further request that this Court enter any and all injunctive relief necessary to ensure that Federal Defendants comply with ANILCA, NEPA, the ESA and the APA, and to prevent irreparable harm until such compliance occurs.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. There is final agency action subject to judicial review pursuant to 5 U.S.C. § 704. An actual, justiciable controversy exists between Plaintiffs and Federal Defendants. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706.

10.     Venue is appropriate under 28 U.S.C. § 1391(e) because a substantial part of the events and omissions giving rise to this action occurred in the District of Alaska,

and the Izembek Refuge is in Alaska.

## PLAINTIFFS

11.     Plaintiff NATIVE VILLAGE OF HOOPER BAY is a federally recognized Tribe located in Alaska's Yukon-Kuskokwim Delta. Native Village of Hooper Bay's Yup'ik citizens harvest several species of geese that migrate through the Izembek Refuge—black brant, emperor geese, and cackling geese—as part of their traditional subsistence way of life.

12.     The citizens of the Native Village of Hooper Bay harvest black brant and emperor geese in the spring after they have fattened up in Izembek. They also harvest black brant, emperor geese, and cackling geese before the birds migrate south to feed in Izembek in the fall. These geese provide critical nutrition in the spring and fall and help the Native Village of Hooper Bay's citizens sustain their connections to the land, each other, and their shared cultural traditions.

13.     For example, one citizen of the Native Village of Hooper Bay that harvests geese that feed in Izembek in the spring prefers these geese because they are fattier and more nutritious than birds that do not stop in Izembek. Harvesting the geese helps him and his community recover from the long winters in the spring, and then again at the end of summer the geese help them prepare for the long winter. He plans to continue hunting geese himself and wants future generations to be able to participate in traditional subsistence harvesting of the geese.

14.     The harm the land exchange and road will cause to the geese and their vital

wetland habitat in the Izembek Refuge would harm Native Village of Hooper Bay's citizens. Harm to the geese—including poor body condition, diminished reproductive success, and reduced survival rates—would have serious consequences to Native Village of Hooper Bay's citizens' subsistence practices and community.

15. Native Village of Hooper Bay passed a resolution opposing the land exchange and road in May 2022. Native Village of Hooper Bay also actively participated in the prior administration's Izembek road process. It submitted scoping comments in May 2024, following the Service's publication of a notice of intent to prepare a supplemental environmental impact statement (SEIS) for a potential land exchange and road through the Izembek Refuge. Native Village of Hooper Bay sought cooperating agency status and meaningful consultation with the Service. Native Village of Hooper Bay participated in government-to-government consultations, public meetings, and subsistence hearings following the publication of the draft SEIS. In January 2025, Native Village of Hooper Bay passed an additional resolution raising concerns about the content of the draft SEIS and reaffirming its commitment to opposing a road through the Izembek Refuge and its openness to finding a reasonable compromise to meet the needs of the people of King Cove. In August 2025, when the new administration published a new draft ANILCA section 810 analysis, Native Village of Hooper Bay commented. It again stressed the importance of Izembek's migratory birds to its subsistence culture and traditions and again asked that the Service consider a marine alternative to protect subsistence. Native Village of Hooper Bay would have engaged in a public process,

environmental review, or congressional outreach regarding the Exchange Agreement had the Secretary undertaken a NEPA or Title XI process. Native Village of Hooper Bay would have participated in ANILCA section 810 hearings if the Service had held hearings in the vicinity of their community.

16. Native Village of Hooper Bay is adversely affected by the Exchange Agreement. Its citizens rely on black brant, emperor geese, and cackling geese that will be harmed by the Izembek land exchange and road. As a result, Native Village of Hooper Bay's citizens' subsistence interests will be harmed, as will their interests in preserving these birds for future generations. Native Village of Hooper Bay's interests in participating in the public process and informing agency decisionmaking are also harmed by Federal Defendants' failure to comply with federal law.

17. Plaintiff NATIVE VILLAGE OF PAIMIUT is a federally recognized Tribe located in Alaska's Yukon-Kuskokwim Delta. Like Native Village of Hooper Bay, Native Village of Paimiut's Yup'ik citizens rely on black brant, emperor geese, and cackling geese for subsistence practices and traditions.

18. For example, one citizen of Native Village of Paimiut that harvests geese that feed in Izembek is a provider for many other families. He usually subsistence hunts for four to six families in the community. He plans to continue hunting geese himself and wants future generations to be able to participate in traditional subsistence harvesting of the geese.

19. Because of the potential harm to the migratory birds on which they rely, in

May 2024, Native Village of Paimiut passed a resolution opposing a land exchange and road through Izembek. Native Village of Paimiut also participated in the prior administration's process. In February 2025, Native Village of Paimiut, with other Yukon-Kuskokwim Delta communities, submitted comments on the 2024 draft SEIS and 2024 draft ANILCA section 810 analysis. Their comments reiterated their opposition to the land exchange and road and requested that they be considered in the Service's ANILCA section 810 analysis. When the current administration published a new draft ANILCA section 810 analysis, Native Village of Paimiut again submitted comments. Native Village of Paimiut would have engaged in a public process, environmental review, or congressional outreach regarding the Exchange Agreement had the Secretary undertaken a NEPA or Title XI process.

20. Native Village of Paimiut is adversely affected by the Exchange Agreement. Its citizens rely on black brant, emperor geese, and cackling geese that will be harmed by the Izembek land exchange and road. As a result, Native Village of Paimiut's citizens' subsistence interests will be harmed, as will their interests in preserving these birds for future generations. Native Village of Paimiut's interests in participating in the public process and informing agency decisionmaking are also harmed by Federal Defendants' failure to comply with federal law.

21. Plaintiff Chevak Native Village is a federally recognized Tribe located in Alaska's Yukon-Kuskokwim Delta. Chevak Native Village's Cup'ik citizens rely on black brant, emperor geese, and cackling geese for their culture and food security. As

stated in the community plan, subsistence practices are "the primary and most necessary form of income and sustenance for virtually every member of the community."

22.     For example, one citizen of Chevak Native Village is a subsistence hunter who harvests geese that feed in Izembek to provide for his family and community. He has observed the landscape and patterns of local wildlife, berries, and other subsistence resources changing due to climate. This makes subsistence practices more difficult than in the past. He plans to continue hunting geese and wants future generations to be able to participate in traditional subsistence harvesting of the geese.

23.     Because of the potential harm to the migratory birds on which they rely, in August 2024, Chevak Native Village passed a resolution opposing a land exchange and road through Izembek. Chevak Native Village also participated in the prior administration's process. In February 2025, Chevak Native Village, with other Yukon-Kuskokwim Delta communities, submitted comments on the 2024 draft SEIS and 2024 draft ANILCA section 810 analysis. Their comments reiterated their opposition to the land exchange and road and requested that they be considered in the Service's ANILCA section 810 analysis. When the current administration published a new draft ANILCA section 810 analysis, Chevak Native Village again submitted comments. Chevak Native Village would have engaged in a public process, environmental review, or congressional outreach regarding the Exchange Agreement had the Secretary undertaken a NEPA or Title XI process.

24.     Chevak Native Village is adversely affected by the Exchange Agreement.

Its citizens rely on black brant, emperor geese, and cackling geese that will be harmed by the Izembek land exchange and road. As a result, Chevak Native Village's citizens' subsistence interests will be harmed, as will their interests in preserving these birds for future generations. Chevak Native Village's interests in participating in the public process and informing agency decisionmaking are also harmed by Federal Defendants' failure to comply with federal law.

25.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a national, nonprofit organization with offices across the country, including Alaska. The Center has more than 93,000 active members. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center brings this action on behalf of its members.

26.     The Center's members reside throughout the United States, including Alaska. The Center works to ensure the long-term health and viability of animal and plant communities across the United States and elsewhere, and to protect the habitat these species need to survive. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.

27.     The Center's members have a long-standing interest in protecting the Izembek Refuge from a land exchange and road. These interests include preserving and enjoying the wildlife, habitat, and wilderness values of Izembek for recreational, aesthetic, and environmental protection purposes. The Center's members have visited Izembek, enjoyed viewing its wildlife, and experienced the wilderness and habitat that

Izembek provides. The Center's members have strong recreational, aesthetic, scientific, and other interests in the wildlife that uses and depends on Izembek, including migratory birds and terrestrial and marine mammals.

28.     For example, one Center member has been visiting the Izembek Refuge since the 1980s. He worked there for many years studying migratory birds and their habitat and fell in love with the Izembek Refuge. Now, even though he no longer works there, he returns again and again for recreational and aesthetic purposes, including boating, wildlife viewing, and berry picking. He plans to go again this summer.

29.     Over the years, the Center's members have engaged in many public processes regarding the Izembek land exchange and road. The Center has also engaged in lobbying and legislative work to protect its members' interests in Izembek. The Center and its members would have engaged in a public process, environmental review, or congressional outreach regarding the Exchange Agreement had the Secretary undertaken a NEPA or Title XI process. The interests of the Center's members in participating in the public process and informing agency decisionmaking are harmed by Federal Defendants' failure to comply with federal law.

30.     Plaintiffs' actual, concrete injuries are traceable to Interior's decision to enter into the Exchange Agreement and to do so without adhering to legally required processes and procedures. These injuries would be redressed by the relief sought in this litigation.

## DEFENDANTS

31.     Defendant Doug Burgum is the Secretary of the U.S. Department of the Interior and is being sued in his official capacity. As the Secretary, he is charged with the supervision and management of all decisions, operations, and activities of the Department and its divisions.

32.     Defendant U.S. Department of the Interior is an executive agency of the United States responsible for oversight of the National Wildlife Refuge System and other public lands. Interior is also responsible for administering the ESA for certain species, including Steller's eiders and sea otters.

33.     Defendant U.S. Fish and Wildlife Service is an agency within the U.S. Department of the Interior and is responsible for the management of the National Wildlife Refuge System. The U.S. Fish and Wildlife Service is also responsible for administering the ESA for certain species, including Steller's eiders and sea otters.

34.     Defendant Sara Boario is the Alaska Regional Director of the Service and is being sued in her official capacity. She is the responsible official who signed the acceptance of the warranty deed issued from KCC to the United States pursuant to the Exchange Agreement.

35.     Defendant U.S. Bureau of Land Management (BLM) is an agency within the U.S. Department of the Interior. BLM issued a patent to KCC pursuant to the Exchange Agreement.

36.     Defendant Kevin J. Pendergast is the Alaska State Director of the BLM and

is being sued in his official capacity. He is the responsible official who signed the patent issued to KCC pursuant to the Exchange Agreement.

37.     Defendant King Cove Corporation is an Alaska Native village corporation organized under the laws of the State of Alaska and based in King Cove, Alaska. Under the Exchange Agreement, the United States conveyed to KCC approximately 484 acres of land in the Izembek Refuge for the purposes of building a road. KCC is named as a defendant solely for purposes of facilitating any relief the Court may order with respect to the lands conveyed to KCC in the Exchange Agreement; Plaintiffs assert no claims and ask for no affirmative relief against KCC.

## STATUTORY BACKGROUND

### Alaska National Interest Lands Conservation Act

38.     Congress passed ANILCA to fulfill its promise to Alaska Native peoples to protect their subsistence rights and to set aside federal lands for conservation. The Alaska Native Claims Settlement Act (ANCSA) of 1971 had declared that "[a]ll aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy . . . including any aboriginal hunting and fishing rights that may exist, are hereby extinguished." 43 U.S.C. § 1603(b). ANCSA transferred $962.5 million in federal funds and approximately 44 million acres of Alaska land to Alaska Native corporations that were to be formed, *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 524 (1998), but did not specifically provide for any lands to be protected for subsistence or conservation. Instead, Congress expressed its expectation that federal and state governments would

"take any action necessary to protect the subsistence needs of [Alaska Native people]." H.R. Rep. No. 92-746 (1971) (Conf. Rep.).

39. Congress soon realized that ANCSA had left open critical issues of federal land conservation, *see, e.g.,* 43 U.S.C. § 1616(d)(2), and that its promise—and trust responsibility—to protect Alaska Native subsistence had gone unfulfilled. Congress therefore enacted ANILCA in 1980 "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so," 16 U.S.C. § 3101(c), and

> to preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resource values and related recreational opportunities . . .; and to maintain opportunities for scientific research and undisturbed ecosystems.

*Id*. § 3101(b).

40. In Title VIII, ANILCA devoted an entire chapter to the protection of subsistence uses, which it defined as

> the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.

16 U.S.C. § 3113.

41. In Title VIII, Congress recognized that the continuation of the opportunity

for subsistence uses, including on public lands, is "essential to Native physical, economic, traditional, and cultural existence." 16 U.S.C. § 3111(1). Congress also found that "the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife" by subsistence users. 16 U.S.C. § 3111(2). In addition, Congress determined that the

> continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, [and] by increased accessibility of remote areas containing subsistence resources.

16 U.S.C. § 3111(3).

42.     In furtherance of ANILCA's protective goals and Title VIII's directive that public lands are to be utilized in a manner that will "cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands," 16 U.S.C. § 3112(1), ANILCA section 810 affirmatively and substantively requires federal agencies to avoid or minimize impacts to subsistence. Nearly all federal land use actions trigger section 810: its requirements must be met any time an agency with "primary jurisdiction" over public lands is "determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions." 16 U.S.C. § 3120(a). Section 810 requires that agencies minimize or eliminate the proposed action's impacts to subsistence

and consider whether there are alternative actions with lesser subsistence impacts. *Id*. Section 810's two-step process first requires the agency to determine whether the action may cause a significant restriction of subsistence uses and needs. To do so, the agency must evaluate (1) the effects of the proposed action on subsistence uses and needs, including downstream and cumulative impacts; (2) the availability of other lands for the action's purpose; and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposal of public lands needed for subsistence purposes." *Id*.

43.     If the agency completes step one and is still interested in pursuing a proposed action that may significantly restrict subsistence uses, ANILCA section 810 allows the agency to proceed only if it has done everything it can to understand and reduce or eliminate impacts. When there is a significant restriction of subsistence uses and needs, step two of ANILCA section 810 requires the agency to provide notice to affected communities, hold hearings in the vicinity of those affected communities, and make several affirmative determinations before proceeding with the proposed action. 16 U.S.C. § 3120(a). The required determinations are that (1) "such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands"; (2) "the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition"; and (3) "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions." *Id*.

44.     These determinations impose substantive obligations on land management

agencies to protect subsistence and limit the actions that an agency may approve.

45.     In carrying out ANILCA's conservation purpose, Congress reclassified more than 104 million acres of lands within Alaska into new or expanded parks, refuges, and other conservation areas. *See, generally,* 16 U.S.C. §§ 3101–3233. In doing so, Congress intentionally drew broad and inclusive boundaries around conservation system units, intending to protect entire ecosystems. 16 U.S.C. § 3101(b); *cf. id.* § 3103(c).

46.     Recognizing that there were parcels of privately owned land, known as inholdings, within the broad conservation system units it was designating, Congress included a provision authorizing the Secretary to acquire those inholdings, without resorting to condemnation, to further the purposes of ANILCA. 16 U.S.C. § 3192. Section 1302 provides that "the Secretary is authorized, consistent with other applicable law in order to carry out the purposes of [ANILCA], to acquire by purchase, donation, exchange, or otherwise, any lands within the boundaries of any conservation system unit." *Id*. § 3192(a). The section's specific provision governing the acquisition of these inholdings through a land exchange, 1302(h), reiterates that the Secretary is authorized to proceed with an exchange only when "acquiring lands for the purposes of [ANILCA]." *Id*. § 3192(h).

47.     Congress also included an entire chapter, Title XI, 16 U.S.C. §§ 3161–73, outlining "a single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems" through conservation system units, *id*. § 3161(c), including roads, *id*. § 3162(4)(B)(vii). Congress found that the Title XI

process was necessary "to minimize the adverse impacts of siting transportation and utility systems within [conservation system] units established or expanded by [ANILCA] and to ensure the effectiveness of the decisionmaking process." *Id*. § 3161(c). Title XI mandates that

> Notwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole, or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with.

*Id*. § 3164(a).

48.     Section 1104 of Title XI imposes a specific process and required findings that must be met prior to any approval of a transportation system. 16 U.S.C. § 3164. Section 1104 contemplates the preparation of an environmental impact statement; additional opportunities for involvement by stakeholders, governmental entities, ANCSA corporations, and the public; and eight detailed findings supported by substantial evidence. *Id*. § 3164(e)–(g). Further, section 1106 imposes additional requirements that must be met prior to any approval of a transportation system in congressionally designated wilderness areas, including a recommendation by the President and approval by Congress. *Id*. § 3166(b), (c).

49.     Looking at what it had achieved, Congress characterized ANILCA as "providing sufficient protection for the national interest in the scenic, natural, cultural, and environmental values on the public lands in Alaska, and at the same time provid[ing] adequate opportunity for satisfaction of the economic and social needs of the State of

Alaska and its people." 16 U.S.C. § 3101(d). Congress also stated its belief that ANILCA

struck the "proper balance between the reservation of national conservation system units

and those public lands necessary and appropriate for more intensive use and disposition."

*Id*.

## National Environmental Policy Act

50.     NEPA "declares a broad national commitment to protecting and promoting

environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348

(1989). NEPA does not mandate particular results, but it does prohibit uninformed

agency action, directing agencies to (1) take a "hard look" at environmental

consequences and (2) "provide for broad dissemination of relevant environmental

information" to the public. *Id*. at 350; *see also* 42 U.S.C. § 4332(2)(C). By instructing

agencies to analyze the environmental consequences of a proposed action, NEPA's

procedures ensure that important effects will not be "overlooked or underestimated only

to be discovered after resources have been committed or the die otherwise cast."

*Robertson*, 290 U.S. at 349.

51.     NEPA requires agencies to prepare an environmental impact statement

(EIS) for all "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). If a proposed agency action "does not have a

reasonably foreseeable significant effect" or if the significance of the effect is unknown,

the agency may instead prepare an environmental assessment. *Id*. § 4336(b)(2).

## Endangered Species Act

52.     Congress enacted the ESA in 1973 "to provide a program for the
conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b).
Congress's "plain intent" in enacting the ESA "was to halt and reverse the trend toward
species extinction, whatever the cost" and "to give endangered species priority over the
'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184–85
(1978).

53.     The ESA directs the Secretary of the Interior through the Service or the
Secretary of Commerce through the National Marine Fisheries Service (the wildlife
agencies), as appropriate, to determine which species of plants and animals are
"threatened" and "endangered" and place them on a list of protected species. 16 U.S.C.
§ 1533. The Service is the wildlife agency responsible for administering the ESA for
northern sea otters and Steller's eiders. An "endangered" or "threatened" species is one
"in danger of extinction throughout all or a significant portion of its range" or "likely to
become an endangered species within the foreseeable future throughout all or a
significant portion of its range," respectively. *Id.* § 1532(6), (20).

54.     The ESA seeks "to provide a means whereby the ecosystems upon which
endangered and threatened species depend may be conserved, [and] to provide a program
for the conservation of such . . . species." 16 U.S.C. § 1531(b). The ESA defines
conservation as "the use of all methods and procedures which are necessary to bring any
endangered species or threatened species to the point at which the measures provided

pursuant to [the ESA] are no longer necessary." *Id*. § 1532(3). Accordingly, the ultimate goal of the ESA is not only to prevent listed species from going extinct, but also to recover these species to the point where they no longer require ESA protection.

55.     Once a species is listed, the ESA provides an array of procedural and substantive protections not provided by any other law. These protections include designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. 16 U.S.C. §§ 1533(a)(3), (f), 1538, 1536. Section 9 of the ESA prohibits any person from "taking" an endangered species without proper authorization. *Id*. § 1538(a)(1)(B). The term "take" is statutorily defined broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Take" includes both direct and indirect harm and it need not be purposeful. The take prohibition applies to any "person," *id*. § 1538(a)(1), including federal agencies, *id*. § 1532(13). The ESA further makes it unlawful for any person, including federal agencies and/or federal officials acting in their official capacity, to "cause to be committed" the take of a listed species. *Id*. § 1538(g).

56.     Section 7(a)(2) of the ESA contains a substantive requirement that all federal agencies ensure their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [their designated critical] habitat." 16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence" means "to engage in an action that reasonably would be

expected . . . to reduce appreciably the likelihood of both the survival and recovery of listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

57.     To comply with section 7's substantive mandate, federal agencies must consult with the relevant wildlife agency whenever an agency action may affect a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Agency action is defined to include "*any* action authorized, funded, or carried out by such agency." 16 U.S.C. § 1536(a)(2) (emphasis added); *see also* 50 C.F.R. § 402.03. This includes the granting of permits. 50 C.F.R. § 402.02. The "may affect" standard includes "*[a]ny possible effect*, whether beneficial, benign, adverse or of an undetermined character . . . .*" Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc). To meet the requirements of section 7, both the action and wildlife agency must use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g).

58.     During consultation, the wildlife agency must consider (1) the aggregate effect of past and ongoing human activities that affect the current status of the species and its habitat ("environmental baseline"); (2) all consequences of the proposed action, including those that occur later in time ("effects of the action"); and (3) the effects of future state and private activities that are reasonably certain to occur ("cumulative effects"). 50 C.F.R. §§ 402.14(g), 402.02. The wildlife agency must consider all these factors in the context of the current status of the species and its habitat. *Id.* § 402.14(g).

Where, as here, the Service is the action agency as well as the wildlife agency, the Service must undertake intra-agency consultation.

59. To complete formal consultation, the wildlife agency must issue a "biological opinion" that explains how a proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (h). The biological opinion includes a determination from the wildlife agency on whether a proposed action is "likely to jeopardize" or "not likely to jeopardize . . . the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h). The ESA's implementing regulations define "[j]eopardize the continued existence of" as "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id*. § 402.02. If the wildlife agency concludes a proposed action will jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, the biological opinion must outline "reasonable and prudent alternatives" to avoid jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

60. If the wildlife agency concludes that an action is reasonably certain to take listed members of the population but will not jeopardize the continued existence of the species, the biological opinion must include an incidental take statement that specifies the impact of the action, generally by setting a numeric limit on take and identifying

"reasonable and prudent measures" that will minimize the impact of that take, among other requirements. 16 U.S.C. § 1536(b)(4)(C). In addition, when take of endangered or threatened marine mammals is involved, the take must first be authorized pursuant to the Marine Mammal Protection Act, and the incidental take statement must include any additional measures necessary to comply with the Marine Mammal Protection Act take authorization. *Id.* § 1543; 50 C.F.R. § 402.14(h)(3). The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under section 9 of the ESA. 16 U.S.C. §§ 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(6).

61.    The adequacy of the wildlife agency's biological opinion is reviewed under the APA. 5 U.S.C. §§ 702-06.

## Administrative Procedure Act

62.    The APA grants a right of federal judicial review to any person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

63.    The APA provides that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or adopted "without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D).

## STATEMENT OF FACTS

### Traditional Subsistence Harvest in the Yukon-Kuskokwim Delta

64.     The Yukon-Kuskokwim Delta is a large, approximately 59,000-square-mile region in western Alaska, with the Yukon River emptying into the Bering Sea to the north and the Kuskokwim River to the south. The Yukon-Kuskokwim Delta is home to more than 50 Yup'ik, Cup'ik, and Athabascan communities, primarily located along the rivers and the coast. Indigenous peoples have lived in the region for thousands of years.

65.     The city of Hooper Bay is located on the Bering Sea coast and is surrounded by the Yukon Delta National Wildlife Refuge. It is the second largest community in the region and home to nearly 1,400 residents. The tribal governments of Native Village of Hooper Bay and Native Village of Paimiut are both located in Hooper Bay, and many enrolled tribal citizens of both Native Villages live in the community. The city of Chevak is located on a bluff along the northern bank of the Ninglikfak River, about 17 miles east of Hooper Bay, and is surrounded by the Yukon Delta National Wildlife Refuge. The community has approximately 1,072 residents, most of whom are enrolled tribal citizens of Chevak Native Village. Chevak Native Village's tribal government, Chevak Traditional Council, is located in Chevak.

66.     Native Villages have deep cultural connections to the land and its resources. Traditional subsistence practices, such as fishing, hunting, and gathering, are integral to their citizens' way of life and have shaped the cultural identity of their communities. Subsistence is integrated into Native Villages' economies, health care,

social safety net, communication systems, education, and nearly every other facet of their day-to-day lives. Community members hunt and fish together, learning from each other and from elders in particular. Children are taught where to go fishing and where to hunt birds and other animals. Passing down that cultural knowledge to the next generation is essential to maintaining Alaska Native culture. Being out hunting and fishing also leads to lessons about how to take care of the land and how to respect the land and the animals. After harvest, children are taught how to preserve and prepare traditional foods. These activities are often done together, facilitating community relationships. Sharing subsistence harvests with other community members also builds and strengthens community cohesion and relationships.

67.     Subsistence foods are also critical for food security because of the high cost of store-bought food, inflationary effects, and inconsistency in availability of groceries from a grocery store. The Yukon-Kuskokwim Delta has the highest food insecurity rates in the state. Even if store-bought food was affordable and reliably accessible, it could not replace the nutrition or cultural value of traditional foods.

68.     Climate change and western management of fish and wildlife and their habitats have led to a decline in the availability of traditional subsistence foods. Often, Native Villages' citizens must travel farther than before to reach traditional foods, increasing cost and safety risks. Fishing and berry gathering has been less consistent than in the past. A crash in salmon populations and resulting closure of subsistence salmon fisheries have affected Native Villages' citizens deeply, as they depend heavily on

salmon for nutrition. The loss of salmon elevates the importance of other traditional foods, like black brant, emperor geese, and cackling geese. The spring-summer harvest of emperor geese was closed statewide in 2025, foreclosing harvest of yet another traditional food.

69.     The loss of healthy foods and opportunities to practice harvesting traditions are linked to adverse health outcomes, including heart disease, diabetes, and effects on mental health. Conversely, when the citizens of Native Villages practice their traditions, they thrive. Subsistence practices create the context for meaningful family and community relationships and active lifestyles, promoting overall healthier living.

70.     Every spring millions of migratory birds travel to the Yukon-Kuskokwim Delta's extensive wetlands and marshes to nest and feed, and the Izembek Refuge is an important stop for many of them along the way. Nearly the entire populations of black brant and emperor geese feed in the Izembek Refuge before making their way north in the spring. These geese are a crucial component of Native Villages' subsistence culture and traditional practices. At the end of Alaska's long winters, the geese are among the first species to return, offering rich, fatty meat that provides essential nutrition and energy. This early bounty is particularly important to community elders, who are especially reliant on traditional foods for nourishment, including health and spiritual benefits.

71.     In the fall, the citizens of Native Villages harvest geese as they migrate back to Izembek, including black brant, emperor geese, and cackling geese. While

cackling geese have a dispersed migratory route in the spring, most of their population stops to feed in Izembek in the fall. At times, these three species of geese make up most of citizens' subsistence diets and are one of only a few things available to eat.

72. These birds also play a key role in maintaining healthy ecosystems in the Yukon-Kuskokwim Delta. Large numbers of geese nesting in the Yukon-Kuskokwim Delta maintain grazing lawns, keeping their forage plants at the optimum level to retain high nutrient content for their young. If the number of geese nesting in the Yukon-Kuskokwim Delta decreases and the forage plants grow past their optimum level, it will take more than a decade for the forage plants to recover, affecting gosling survival and reproductive success in the meantime.

73. Because of how important the geese are to their way of life, Native Villages have worked for decades to conserve them. For example, since the 1980s, Native Village of Hooper Bay has been a leader in efforts to protect and co-manage important goose habitat and nesting areas in the Yukon-Kuskokwim Delta and throughout western Alaska. Native Village of Hooper Bay worked cooperatively with the Service, the State of Alaska, and other states along the Pacific Flyway to develop and pursue recovery efforts through the 1984 Hooper Bay Agreement, now known as the Yukon-Kuskokwim Delta Goose Management Plan.

74. In the same timeframe, Native Village of Hooper Bay's elders also urged the community to adopt their own restrictions to protect nesting geese. For decades, Native Village of Hooper Bay's citizens have curtailed their own harvesting activities—

including restricting how and when they hunt and gather eggs—to ensure the continued health of black brant, emperor geese, and other migratory bird populations.

## The Izembek Refuge

75.     The Izembek Refuge is located at the end of the Alaska Peninsula in Southwest Alaska, between the Bering Sea and the Gulf of Alaska. The area has been stewarded for thousands of years by the Unangan people.

76.     The Izembek Refuge has enormous ecological value. Its lagoons host extensive tidal marshes and eelgrass beds that provide the foundational habitat structure for a rich and diverse array of invertebrates, fish, birds, and mammals. Its tidal marshes and seagrasses, including eelgrass, are among the most productive ecosystems in the world and offer a powerful natural form of carbon sequestration. They also nurture the black brant, emperor geese, and cackling geese on which Native Villages rely, as well as other fish and wildlife species, including ESA-listed Steller's eiders and northern sea otters.

77.     The United States government recognized the specialness of the area and its importance for waterfowl, brown bears, caribou, and other wildlife when it established the Izembek National Wildlife Range in 1960. 25 Fed. Reg. 12,599, 12,600 (Dec. 6, 1960). Congress redesignated the area as the Izembek National Wildlife Refuge when it enacted ANILCA in 1980 and designated approximately 307,982 acres of the 315,000-acre Refuge as Wilderness. Congress explained that

The Izembek Wilderness possesses outstanding scenery, key populations of

brown bear, caribou and other wilderness-related wildlife, and critical watersheds to Izembek Lagoon. About 68 percent of the total lands in Izembek Lagoon are covered with the largest eelgrass beds in the world. These beds are utilized by millions of waterfowl for migration and wintering purposes. A wilderness designation will protect this critically important habitat by restricting access to the lagoon.

H.R. Rep. No. 96-97, at 136 (1979).

78.     Izembek Refuge is also internationally recognized for its remarkable and ecologically significant wetlands: in 1986, the Izembek Refuge was the first North American site to be designated as a Wetland of International Importance by the Ramsar Convention on Wetlands of International Importance, which promotes wetland conservation throughout the world.

79.     The Izembek Refuge features a narrow isthmus between Izembek Lagoon to the north and Kinzarof Lagoon and Cold Bay to the south. The Izembek and Kinzarof lagoons and adjacent areas of the Izembek Refuge support hundreds of thousands of waterbirds during their long-distance migrations between breeding and wintering areas.

80.     Nearly the entire population of black brant, most of the population of cackling geese, and significant numbers of emperor geese rely on the rich eelgrass beds of Izembek to fuel their migrations. Recently, large numbers of black brant have begun overwintering in Izembek. While in the Izembek Refuge, brant, emperor geese, and cackling geese build fat reserves necessary for significant events in their life cycles, such as migration, nesting, and preparing for the winter season. These geese tie the Native Villages, and many other communities in the Yukon-Kuskokwim Delta, to the Izembek

Refuge. Black brant and emperor geese stop in Izembek in the spring before continuing their journey north to the Yukon-Kuskokwim Delta, where Native Villages' citizens harvest them for subsistence. They go back through Izembek Refuge in the fall, along with cackling geese, another important subsistence species for Native Villages' citizens.

81. The Alaska-breeding population of Steller's eiders—a migratory sea duck that spends the majority of its life, outside of nesting, in the marine environment—also relies on Izembek and Kinzarof lagoons and adjacent areas of the Izembek Refuge. The Alaska-breeding population of Steller's eiders has been listed as threatened under the ESA since 1997. Today the Alaska-breeding population of Steller's eiders is estimated to be 406 individuals. The listed population's low numbers and restricted breeding range make it vulnerable to many threats, and the Service has recognized that the mortality of only a few breeding adults could lower the resiliency of the entire population.

82. Alaska-breeding Steller's eiders breed and nest primarily in tundra wetlands near Utqiagvik, typically spending late May to August in the Arctic. Following a post-breeding period, Steller's eiders begin a southwest migration. Steller's eiders begin arriving in Izembek and other molting sites on the Alaska Peninsula in late August. There, they begin a molting period, losing all feathers, which renders them flightless and with impaired diving abilities for approximately a month. During this impaired molting period, Steller's eiders prefer shallow, protected areas, like Izembek Lagoon, that include eelgrass beds and intertidal mudflats with relatively easy access to prey, primarily protein-rich marine invertebrates. Following the completion of their molt, Steller's eiders

begin a wintering period, where some disperse and others remain in their molting lagoons. Pair bonding and courtship behavior begins in late winter and is completed prior to departure to breeding grounds in April.

83.     Members of the non-listed Russian-Pacific breeding population of Steller's eiders also molt and winter in Izembek, intermixing with the Alaska-breeding population. The Alaska-breeding population is recognized as a distinct population segment because it is both discrete and significant. The population is discrete due to its physical separation from the Russia nesting populations and because it is delimited by an international boundary that marks differences in conservation status, which is demonstrated by the significantly higher abundance of the Russian-Pacific breeding population. And the Alaska-breeding population is significant because the loss of the population would represent a significant reduction in the species' breeding range worldwide.

84.     The Service designated critical habitat for Alaska-breeding Steller's eiders in 2001, including all of Izembek Lagoon. Izembek Lagoon is considered essential to the eiders' recovery because it hosts large numbers of eiders during the fall through spring months. It is also considered critical because eiders are especially vulnerable to disturbance and contamination due to flightlessness while molting there. During the fall molt and staging, as well as staging during spring migration, large numbers of Steller's eiders (both the Alaska-breeding population and the non-listed Pacific Russia-breeding population) frequent Izembek and Kinzarof lagoons. The eiders feed on marine invertebrates in the expansive eelgrass beds in both lagoons. The eiders fly over the

Izembek Refuge's narrow isthmus, between Izembek Lagoon and Kinzarof Lagoon.

85.     The Service's 2019 Species Status Assessment of the Alaska-Breeding Population of Steller's Eiders recognizes several factors affecting the eiders' survival and reproductive capacity during the nonbreeding season. One is the availability of eelgrass bed communities, which influences the quantity and quality of marine invertebrates.

86.     Adequate invertebrate food sources are crucial for eiders to meet their high nutrient acquisition and energetic requirements during molt, wintering, migration, and staging periods. If the eiders are unable to meet their nutrient requirements, their body condition may decrease, lowering survival probability, reducing breeding propensity, and/or causing nest abandonment. Damage to Izembek's eelgrass beds, and therefore the availability and quality of food resources in the non-breeding areas, would have serious negative implications for eiders' ability to survive the winter and reproduce the following season. Populations of marine invertebrates in Izembek Lagoon have already declined due to the changing climate. Recent studies have shown significantly reduced biomass and mean size of benthic invertebrates since 1998, likely due to warming seas and reduced winter sea ice covering the Lagoon. Climate projections show that the marine invertebrate food sources eiders rely on will continue to decline in some areas, including Izembek Lagoon.

87.     Stressors to Steller's eiders include shooting, human disturbance, construction of new infrastructure, habitat loss, and collisions. Changes to the eiders' habitat include melting permafrost in Arctic breeding grounds and changes in the marine

environment caused by climate change. The Service predicts that the current stressors faced by eiders "will continue, and possibly increase in magnitude due to the changing arctic and subarctic climate and expanding infrastructure and resource development within [their] range." The Service further predicts that the cumulative and/or synergistic effects of habitat changes and current and future stressors are likely to negatively affect the population to the point where it will be in danger of extirpation in the foreseeable future.

88.     The southwest Alaska Distinct Population Segment (DPS) of northern sea otters was listed as threatened under the ESA in 2005. The sea otters appear year-round in marine waters adjacent to the Izembek Refuge, and the species has designated critical habitat in the Izembek and Kinzarof lagoons as well as Cold Bay. Sea otters have also been observed crossing the isthmus between Izembek and Kinzarof lagoons.

89.     Northern sea otters forage almost exclusively on bottom-dwelling marine invertebrates that rely on an abundance of eelgrass beds for their survival. As climate change is causing a global decline in sea otter habitat like kelp forests and seagrass meadows, the importance of the Izembek Refuge eelgrass beds has grown. Warming oceans also promote harmful algae blooms and increase the spread and abundance of pathogens that harm sea otters.

90.     Stressors to northern sea otters include warming oceans and ocean acidification due to climate change; oil spills and other contamination resulting from increasing ship traffic; oil and gas activities; subsistence harvest; diseases; and killer

whale predation.

91.     The Marine Mammal Protection Act prohibits hunting of northern sea
otters, 16 U.S.C. § 1371(a), with the exception of harvest for subsistence purposes by
Alaska Natives who dwell along the coast, *id*. § 1371(b). Current subsistence harvest
numbers for the southwest Alaska DPS of northern sea otter are considered sustainable,
with little population level impacts.

### The Cost of a Road Through Izembek

92.     The government has studied the likely impacts of a road on the Izembek
Refuge and the species that rely on it. A road and its construction, operation,
maintenance, and anticipated increase in offroad all-terrain vehicle (ATV) activity and
visitation to the Izembek Refuge would perpetually damage its rich ecosystems and the
many species that rely on the Izembek Refuge for their survival, including black brant,
emperor geese, cackling geese, Steller's eiders, and northern sea otters. A road would
damage crucial feeding habitat, disrupt movements, and have significant negative
population-level effects on the geese, as well as other species the Izembek Refuge was
established to protect. A road would bisect a section of the Izembek Refuge that is an
important corridor for geese, Steller's eiders, and sea otters traveling between marine
feeding grounds in Izembek and Kinzarof lagoons. Much of the habitat in the road
corridor is upland tundra that is dominated by crowberry vegetation, which provides
important fall forage for cackling geese, emperor geese, shorebirds, and brown bears.
Vehicle traffic on a road would displace wildlife from crowberry feeding areas. Geese

have been observed to use crowberry habitats less near roads.

93.     The habitat damage caused by soil removal, excavation, gravel mining, and airborne dust during construction, maintenance, and use of the proposed road would not be confined to the road itself but would encompass a much wider area. Damage would include long-term changes in hydrology, snow patterns, soil characteristics, and ecosystem processes.

94.     There would also be additional damage from increased ATV use that the road will facilitate. Since construction of the King Cove Access Road along the shore of Cold Bay to the boundary of the Izembek Refuge, ATV use and its attendant harms have increased. Habitat destruction by ATV travel over tundra is generally severe and long-lasting in this region of Alaska. Thus, an additional 19 miles of road would lead to major habitat destruction, including loss of critical breeding and feeding sites, and wildlife harassment over a much wider area than the road corridor.

95.     A road would likely lead to an increase in harvest of black brant, emperor geese, and cackling geese in the Izembek Refuge. Brant and emperor geese are especially vulnerable to overharvest in the spring because significant proportions of their overall breeding populations are concentrated in the Izembek Refuge to fatten up prior to migration to nesting grounds in the Yukon-Kuskokwim Delta and elsewhere. Overall population sizes of these goose species are in decline, with black brant declining by 30 percent, cackling geese declining by 25 percent, and emperor geese declining by 7 percent. A road would provide increased access to Izembek and Kinzarof lagoons, which

would put these geese at greater risk of population declines given their population-level dependence on the Izembek Refuge.

96.     Black brant and Steller's eiders are particularly susceptible to adverse effects of human disturbances. Motorized boats, ATV activity, and hunting are highly disturbing to both species. Disturbances cause harm through increased energy expenditure, reduced feeding, and displacement from preferred foraging areas. Scientists have shown that any increases in current rates of disturbance could lower the number of black brant migrating in spring and breeding successfully. This is because black brant already spend all or nearly all their time feeding in winter and spring and therefore are unable to compensate for lost foraging opportunities and increased energy expenditure by increasing rates of food intake.

97.     Prior analyses of road impacts have concluded that a road through Izembek Refuge could displace Steller's eiders from areas of Izembek Lagoon and Kinzarof Lagoon. Increased foot and ATV traffic resulting from the road is likely to lead to disturbance to eiders, particularly during flightless molting periods. Disturbed eiders would likely leave preferred feeding areas, expending energy and decreasing their ability to recover from molting. Steller's eiders are especially vulnerable when molting due to their flightless state. Disturbed eiders expend energy, which decreases their ability to recover from molting and displaces them from preferred feeding areas. Studies have shown that eiders that molt at Izembek Lagoon have a high degree of fidelity to that specific lagoon. This tendency to return to a habitat area, even if it becomes an area of

high disturbance, can lead to declines in both overall population productivity and fitness of individual members of the species. Steller's eiders could also suffer direct injury or mortality if they collide with a water vessel while in Izembek or Kinzarof lagoons or are struck by a vehicle or shot while flying across the isthmus between the lagoons. Steller's eiders may also be accidentally shot by hunters seeking to harvest other migratory birds.

98.     Studies have also found that Izembek Lagoon is an area of high sea otter concentration and that development in the Izembek area, including construction and higher vessel traffic resulting in increased noise and visual disturbances, may disturb otters and reduce valuable feeding time. Sea otters are also vulnerable to being struck by water vessels. Sea otters have also been observed crossing the isthmus between Izembek and Kinzarof lagoons; if a road is built through the isthmus as proposed, sea otters would be vulnerable to being hit by passing vehicles. Increased access to the area by waterfowl hunters due to the road could also disturb sea otters.

99.     A road would jeopardize the integrity of the entire eelgrass ecosystem that supports most of the fish and wildlife species in the Izembek Refuge, including geese, Steller's eiders, and northern sea otters. Climate change is causing a decline in populations of marine invertebrates that live in the eelgrass of Izembek and Kinzarof lagoons and provide a primary food source for Steller's eiders, northern sea otters, and other wildlife. Changes in hydrology and water quality from a road would harm the eelgrass meadows by altering water clarity, salinity levels, sediment transport, and light availability, potentially leading to reduced eelgrass abundance and distribution, and

thereby degrading the entire food web that it supports.

### History of the Izembek Road

100.    The Izembek Refuge is adjacent to the community of King Cove, which was established in the early 1900s to support a salmon cannery. Today there are about 750 residents of King Cove. Since at least the 1980s, King Cove residents have sought a road through the Izembek Refuge.

101.    In the 1980s and 1990s, the Department of the Interior (Interior) and the Service conducted analyses of a road and found it would have negative effects on the Izembek Refuge's environment, wildlife, and subsistence uses. Interior also concluded that a road through the Izembek Refuge would require congressional approval under ANILCA Title XI.

102.    In 1999, the Aleutians East Borough (Borough) was awarded $37.5 million through the King Cove Health and Safety Act to construct a marine-road link between the two communities and to improve the King Cove airport and medical clinic, thereby addressing the health and safety concerns of King Cove residents without constructing a road through the Izembek Refuge. In 2003, the U.S. Army Corps of Engineers authorized construction of a road from King Cove to a hovercraft terminal in Lenard Harbor, northwest of the community, from which a hovercraft would carry King Cove residents to Cold Bay. The Borough purchased a hovercraft and began operating it in 2007. The Borough suspended hovercraft operations in 2010.

103.    King Cove residents continued to advocate for a road crossing the Izembek

Refuge, and Congress in 2009 directed Interior to determine whether a land exchange and road would be in the public interest. Later that year, the Service began an environmental review of the land exchange and road, which would include exchanging approximately 206 acres from the Izembek Refuge and an additional 1,600 acres from the Alaska Maritime National Wildlife Refuge for a little over 56,000 acres of land owned by the State and KCC. Noting Interior's legal obligations under the National Wildlife Refuge System Administration Act, ANILCA, and the public land order first withdrawing Izembek lands, in 2013 then-Secretary of the Interior Sally Jewell determined that a road through the Izembek Refuge would significantly degrade irreplaceable ecological resources. Secretary Jewell issued a decision in which she declined the land exchange and supported a landing craft/ferry proposal that would utilize the existing road and hovercraft facilities.

104.    King Cove, along with other groups, unsuccessfully challenged Secretary Jewell's decision in this court. While that case was pending, a new administration took office and brought in a new Secretary. In response to a formal request from KCC, in 2018 Secretary David Bernhardt agreed to exchange up to 500 acres in the Izembek Refuge for a road. Several conservation groups challenged the 2018 decision, and this Court vacated it. KCC then requested that Secretary Bernhardt reconsider a land exchange, and in 2019 Secretary Bernhardt approved an agreement similar to the vacated 2018 agreement. Conservation groups challenged the 2019 agreement, which this Court also vacated.

105.    During the pendency of the challenge to the 2019 agreement, the Biden

administration took office and brought in a new Secretary. Secretary Deb Haaland visited

King Cove in 2022, and, in March 2023, she withdrew the 2019 agreement and directed

the Service to prepare a supplemental EIS analyzing the effects of a land exchange and

road.

106.    According to Secretary Haaland, the 2019 agreement contained procedural

flaws and was inconsistent with Interior policy. Secretary Haaland found Interior had

failed to consider the effects of the 2019 Land Exchange on subsistence uses. Interior had

also failed to conduct an adequate NEPA and ESA analysis for the 2019 Land Exchange.

107.    In announcing a new process to consider King Cove's transportation

options, Secretary Haaland pledged to "listen[]—really listen[]—to Tribal communities,"

but she did not meet with Yukon-Kuskokwim Delta Tribes.

108.    The Service issued a notice of intent to prepare an SEIS in 2023. In

November 2024, the Service made available for public comment a draft SEIS and draft

ANILCA section 810 analysis. The Service's preferred alternative in the 2024 draft SEIS,

Alternative 6, involved the exchange of nearly 500 acres of lands in the Izembek Refuge

for 31,198 surface acres belonging to KCC. The road contemplated in Alternative 6

would be restricted to non-commercial uses and would include mitigation measures such

as guard rails.

109.    The 2024 draft ANILCA section 810 analysis found that the land exchange

and road would significantly restrict subsistence uses for the five communities it studied

(King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point), resulting from both

the proposed road as well as from its cumulative impacts. It additionally found that Yukon-Kuskokwim Delta communities "could meet the 'may significantly restrict' threshold based on a reduction in abundance in certain migratory birds harvested by communities in the Yukon-Kuskokwim Delta."

**The Decision Challenged Here**

110.    In January 2025, the Trump administration took office, and Doug Burgum was confirmed as the new Secretary. In August 2025, the Service provided notice to a few stakeholders inviting the public to attend and testify at ANILCA Section 810 Hearings for a 2025 Proposed Land Exchange and Road Corridor. This was the first time Plaintiffs learned that the new administration had abandoned the prior process and would not be completing the 2024 draft SEIS and ANILCA section 810 analysis. A new draft ANILCA 810 analysis was the only draft document made available to the public regarding the new process. ANILCA Section 810 hearings were not held in the vicinity of Native Villages.

111.    On October 23, 2025, in the fourth week of the government shutdown, the Secretary announced that he had signed a land exchange agreement with KCC and that a patent for the Izembek Refuge lands had already been issued to KCC. Later that day the Service published four documents online: the Exchange Agreement with King Cove Corporation, dated October 21; a King Cove Corporation Land Exchange Deed, dated October 22; a King Cove Corporation Land Exchange Patent, dated October 22; and a document called the Decision of the Secretary Concerning a Proposed Land Exchange

Between the Secretary of the Interior and King Cove Corporation Involving Lands Within Izembek National Wildlife Refuge, Alaska, dated October 21. The next week, the Service published online a Biological Opinion for the Proposed National Wildlife Refuge Land Exchange for a Road Corridor, dated October 14.

112.    The Exchange Agreement states that the land exchange was made pursuant to ANILCA section 1302(h), 16 U.S.C. § 3192(h), and that the agreement is a conveyance to an Alaska Native Corporation, subject to section 910 of ANILCA, 43 U.S.C. § 1638. The Exchange Agreement states that the United States is conveying approximately 490 acres in exchange for specific KCC lands to "provide a corridor for the construction and operation of a public road between King Cove and Cold Bay." It states that the road shall be a single-lane gravel road. It further states that construction and operation of the road must comply with any requirements laid out in the Service's biological opinion under the ESA and the National Marine Fisheries Service's Essential Fish Habitat measures. The Exchange Agreement also states that it incorporates mitigation measures KCC has agreed to as part of the "Final Proposed Action with Addendum for the Proposed Izembek Land Exchange, dated October 14, 2025, for design, construction, operation, and maintenance of the road corridor."

113.    The land exchange deed states that in consideration of the exchange of lands the Service paid KCC $48,050 and received 1,737.24 acres of surface estate.

114.    The patent grants 489.96 acres to KCC, subject to the terms and conditions of the Exchange Agreement.

115.    The decision document contains the agency's decision and rationale. It also

contains three appendices: Appendix A is the proposed land exchange agreement;

Appendix B is a final ANILCA section 810 analysis; and Appendix C is a comment

summary from the 2024 draft SEIS.

116.    The decision document describes the purpose of the Exchange Agreement

as

> to acquire land interests within the Izembek National Wildlife Refuge
> (Izembek Refuge) from KCC that further the purposes of the Alaska National
> Interest Lands Conservation Act (ANILCA) in exchange for providing KCC
> with lands that would allow KCC to pursue the construction and operation of
> a long-term, safe, reliable, and affordable year-round road from King Cove
> to the airport in Cold Bay.

117.    The decision document describes the land exchange as involving the

exchange of approximately 490 acres of federal public lands, 484 of which are in the

Izembek Refuge, for approximately 1,739 acres of KCC surface lands within the

boundaries of the Izembek Refuge. It also states that the United States will make a

payment to KCC to equalize the value of the exchange. The decision document states that

KCC will relinquish ANCSA selection rights to 5,430 acres of KCC selected lands within

the Izembek Refuge.

118.    While the decision document acknowledges that the purpose of the

exchange is to facilitate a road, it states that it does not authorize any ground disturbing

activities.

119.    The decision document states that the road will follow the same route as

Alternative 6 in the 2024 draft SEIS. The road would be 18.9 miles, most of which is in the Izembek Refuge. The design contemplates a 13-foot-wide, single-lane gravel road, with approximately 113 turnouts. It would require 13 material sites along the corridor, and approximately 1.7 million cubic yards of material would be moved. The total footprint would be 186 acres.

120.    The proposed road would require one bridge, seven culverts or small bridges, and 63 cross-drainage culverts.

121.    Materials would be delivered by barge. Construction would extend over two seasons and occur between May and November.

122.    The road is not restricted to medical uses or noncommercial uses. The Secretary has not imposed any use restrictions on the road.

123.    In the decision document, the Secretary stated that the land exchange was executed pursuant to ANILCA section 1302(h), 16 U.S.C. § 3192(h). The Secretary explicitly rejected Secretary Haaland's exclusive reliance on ANILCA's conservation and subsistence purposes to support a land exchange under ANILCA section 1302(h). The Secretary characterized Secretary Haaland's analysis as a misinterpretation of the statute, stating that it omitted additional purposes of ANILCA, which he asserted are found in section 101(d): "provid[ing] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." *Id*. § 3101(d).

124.    The Secretary then purported to balance ANILCA's conservation and subsistence purposes against "the economic and social needs of the State of Alaska and

its people." The Secretary found that the land exchange

> furthers the purposes of ANILCA because it strikes the proper balance between protection of scenic, natural, cultural, and environmental values; provides opportunities for continued subsistence uses; and, more generally, for the long-term social and physical well-being of the State of Alaska and in particular the public health and safety and a broader set of economic and social needs of the Native and non-Native residents of King Cove.

125.    In describing economic and social benefits, the Secretary focused on the community of King Cove, describing benefits to health and safety and the ability of the community to obtain groceries and other supplies.

126.    The Secretary acknowledged that "[t]he Proposed Land Exchange would bring fewer benefits to persons outside of the vicinity of the proposed road and for the State of Alaska." He then stated that there would be "some" benefits, noting that "[t]here may be additional opportunities to travel to King Cove."

127.    The Secretary did not describe any other benefits to Alaskans outside of the King Cove/Cold Bay area. The Secretary did not weigh the conservation, subsistence, social, or economic impacts of the land exchange and road on the rest of Alaska. The Secretary did not weigh the conservation, subsistence, social, or economic impacts of the land exchange and road on Native Villages.

128.    The decision document contains a brief discussion of rejected alternatives to the proposed land exchange and road, including one paragraph discussing the hovercraft and ferry options.

129.    The decision document states that a NEPA analysis is neither required by

law nor necessary to inform the Secretary's decision. It states that the Secretary nevertheless "reviewed and considered the additional NEPA analysis, input, and comments from the 2024 Draft SEIS."

130.    The decision document states that there is no pending ANILCA Title XI process.

131.    In the decision document, the Secretary described his understanding of the legal requirements of ANILCA section 810. He then described recent ANILCA section 810 processes, including the Service's 2024 analysis, as well as the 2025 draft and final analyses.

132.    In a section titled "Findings and Conclusions," the Secretary stated that he found "the 2024 preliminary [ANILCA section 810] findings to be overly broad for Alternative 6; that is, it found that there may be a significant restriction when, properly evaluated, it should not have." He then stated that he disagreed with the Service's 2025 final ANILCA section 810 analysis and that "to the extent the cumulative case is even required" it "*would not* significantly restrict subsistence uses."

133.    Appendix B contains the Service's final ANILCA section 810 analysis. In it, the Service analyzes subsistence impacts from the land exchange and road for five study communities: King Cove, Cold Bay, False Pass, Nelson Lagoon, and Sand Point.

134.    The ANILCA section 810 analysis also states that it considered communities in the Yukon-Kuskokwim Delta region in the cumulative analysis because of the particular importance of migratory birds, including Pacific black brant and emperor

geese, to these communities' subsistence uses.

135.    The ANILCA section 810 analysis is divided into two analyses: one for the proposed land exchange and road and one for the cumulative case.

136.    The analysis for the land exchange and road does not consider Yukon-Kuskokwim Delta communities. It concludes that the proposed land exchange and road would not result in a significant restriction to subsistence uses for the study communities of Cold Bay, King Cove, False Pass, Nelson Lagoon, or Sand Point.

137.    The analysis for the cumulative case focuses primarily on the study communities but also includes a discussion of impacts to Yukon-Kuskokwim Delta communities.

138.    The analysis for the cumulative case states that the Yukon-Kuskokwim region may be "particularly vulnerable" to impacts to brant and emperor geese. It acknowledges that these birds are especially important in Yukon-Kuskokwim Delta communities because they provide fresh meat after a long winter.

139.    The analysis describes declines in black brant populations, especially in the birds that nest in the Yukon-Kuskokwim Delta. It states that the decline may be driven by a reduction in foraging habitat, which is compounded by a declining population because a high number of birds is required to maintain preferred forage plant levels.

140.    The analysis describes potential impacts from the proposed road, including increased stress to the birds and habitat loss. The analysis acknowledges that these changes may contribute to population declines. As more birds overwinter in the Izembek

Refuge, there is also an increasing likelihood of extreme events that could have population-level effects that would compound road-related impacts.

141. The analysis describes countervailing access benefits for King Cove and Cold Bay. Yukon-Kuskokwim Delta communities will not benefit from increased access.

142. The analysis's evaluation of other alternatives that would reduce or eliminate subsistence impacts fills less than one page. Regarding the marine alternatives, it states that they were considered in the 2024 draft ANILCA section 810 analysis and are not evaluated further.

143. The Service determined that the cumulative case may result in a significant restriction of subsistence uses for the study communities but that there would be no significant restriction for Yukon-Kuskokwim Delta communities.

144. The Service found that emperor geese and black brant may experience population declines under the cumulative case. This could lead to a large reduction in resource abundance for King Cove and Cold Bay.

145. Regarding the Yukon-Kuskokwim Delta communities, the Service stated that "a population decline does not necessarily mean that there will be a substantial reduction in abundance for subsistence users."

146. The Service stated that in determining whether a population decline could lead to a substantial reduction, it considers "population trends, subsistence harvest amounts, and the relative contribution of individual resources to a community's subsistence diet."

147.    Based on these factors, the Service concluded that there would be no substantial restriction for Yukon-Kuskokwim Delta communities, although communities reliant on black brant and emperor geese "would likely experience cultural impacts if there is any decline in their population or availability."

148.    There is no NEPA analysis for the decision.

149.    The Service completed formal consultation under the ESA section 7 for the land exchange for a proposed road corridor on October 14, 2025. The Service's biological opinion considers impacts on the threatened Alaska-breeding population of Steller's eiders, the threatened southwest Alaska DPS of northern sea otters, and their respective designated critical habitats.

150.    The biological opinion states that the proposed action is a land exchange, the purpose of which is to provide KCC with lands to pursue the construction and operation of a road between King Cove and Cold Bay. The biological opinion recognizes that the land exchange would cause the construction of a road and increased access to Izembek Lagoon after the road is constructed. The biological opinion states that the Service expects adverse effects to Steller's eiders, northern sea otters, and their critical habitats from road construction, maintenance, and use.

151.    The biological opinion recognizes that the low numbers and restricted breeding range of Steller's eiders mean the listed population is vulnerable to many threats.

152.    The biological opinion also recognizes that habitat loss and degradation

from construction in coastal marine areas—including gravel extraction and construction of roads—destroys and degrades marine habitats the eiders use for fall molting, wintering, and spring staging. The biological opinion states that development in important areas used by concentrations of Steller's eiders could have a greater effect through impacts to adult survival or carry-over effects that impact breeding propensity and reproductive success.

153. The biological opinion also recognizes that anthropogenic disturbance is a threat to eiders, with the greatest concern being vessel traffic or other sources of disturbance in molting areas between August and November, when Steller's eiders undergo their flight-feather molt and have a limited ability to move away from sources of disturbance while also being under high energetic demands. Anthropogenic disturbance in important areas used by concentrations of Steller's eiders, including in Izembek Lagoon, could have a greater effect through impacts to adult survival or through carry-over effects that affect breeding propensity and reproductive success. The biological opinion recognizes that a high degree of fidelity to Izembek Lagoon and specific areas within the lagoon would expose Steller's eiders to cumulative disturbance effects during repeated or prolonged events near their preferred habitat patches.

154. The biological opinion states that inadvertent harvest of eiders is already estimated at 86 per year, which is unsustainable for a population estimated at 406 individuals.

155. The biological opinion also states that Steller's eiders have a high risk of

collision with vessels because of their tendency to fly low and fast over water, and that the risk of Steller's eider mortality through collisions is expected to increase as infrastructure and vessel traffic increase throughout their range.

156.    The biological opinion also states that, due to climate change, there is a high uncertainty of prey availability for Steller's eiders in molting, wintering, and spring staging areas over the next few decades. Changing prey availability could result in lowered body condition or survival for molting eiders. The biological opinion recognizes that there has been a significant reduction in the total biomass of the invertebrate prey species eiders prefer.

157.    The biological opinion estimates that an average of approximately 48 to 59, but possibly more than 97, Alaska-breeding Steller's eiders use Izembek Lagoon to molt each year. The biological opinion estimates that approximately 177 to 243 Alaska-breeding Steller's eiders overwinter in the Izembek Lagoon and surrounding areas. The biological opinion estimates that the majority of the 406 Alaska-breeding Steller's eiders use Izembek Lagoon and surrounding areas for spring staging.

158.    For Alaska-breeding Steller's eiders, the biological opinion concludes that the effects of the action are:

    a.  Disturbance caused by noise generated by road construction activities;

    b.  Disturbance caused by increased water vessel activity;

    c.  Disturbance caused by an increase in hunting activities;

    d.  Disturbance caused by an increase in ATV use;

e.  Injury or death caused by an increase in hunting activities resulting in inadvertent harvest, with an estimate of one Alaska-breeding Steller's eider killed per year;

f.  Injury or death caused by a water vessel strike, with an estimate of one Alaska-breeding Steller's eider killed every 6.25 to 50 years; and

g.  Reduced fitness and decreased survival probability for individuals exposed to contaminant spills.

159.  The biological opinion concludes that road construction and use would result in permanent ecological change, which would have cascading effects on adjacent marine areas. It also recognizes that the Service has concluded in the past that a high level of permanent ecological degradation to habitat would occur from construction of the road.

160.  For the designated critical habitat of both the Alaska-breeding Steller's eiders and southwest Alaska DPS of northern sea otters, the biological opinion concludes that the effects of the action are:

a.  Turbidity and sedimentation in areas where degraded instream inputs enter Izembek Lagoon, leading to a reduction in the quantity and/or quality of marine invertebrates, marine benthic communities, and eelgrass habitats;

b.  Reduced growth and die-offs of eelgrass and macroinvertebrate species from spill events and other environmental contaminants; and

c.  Permanent ecological change along the Izembek Isthmus, including

changes in water quantity and quality into Izembek Lagoon and a reduction in quantity and/or quality of nearshore marine invertebrates, marine benthic communities, and eelgrass habitats through habitat loss and degradation.

161.    The biological opinion concludes that the action would result in a minor reduction in reproduction and productivity of Steller's eiders through the loss of a small number of individuals that would be killed, injured, or suffer a sufficient reduction in fitness to have decreased survival. It also concludes that disturbance in wintering and spring staging areas would have an additive increase to the environmental baseline conditions and may disrupt courtship behaviors, potentially reducing pair formation or reproductive timing.

162.    The biological opinion concludes that the action is not likely to jeopardize the continued existence of Alaska-breeding Steller's eiders. The jeopardy analysis is entirely conclusory.

163.    The biological opinion's jeopardy analysis does not add the effects of the road on Steller's eiders to the environmental baseline, cumulative effects, and all other activities and influences that affect the status of the species, including climate change and development outside of Izembek.

164.    The biological opinion does not include an incidental take statement for Alaska-breeding Steller's eiders and concludes that one is not required.

165.    The biological opinion states that Izembek Lagoon supports a high proportion of sea otter mothers with pups and may provide important natal habitat. It

concludes that sea otter mothers would be most likely to experience the consequences of increased stress and energy costs due to disturbance because of their reduced body condition.

166. For the southwest Alaska DPS of northern sea otters, the biological opinion concludes that the effects of the action are:

    a. Disturbance caused by increased water vessel activity, hunting, and ATV use, with a high proportion of sea otters in the area experiencing disturbance at some point and a resulting disruption in behaviors that would increase stress and energy deficits and therefore reduce fitness for a small number of individuals, such as mothers with pups;

    b. Injury or death caused by water vessel strikes, with an estimate of two to four sea otters being injured or killed by vessel strikes per year in Izembek Lagoon;

    c. Injury or death caused by exposure to contaminants, with sea otters exposed to contaminants suffering reduced fitness and decreased survival probability; and

    d. Injury or death caused by harvest, with an estimate of eight sea otters harvested from Izembek Lagoon per year.

167. The biological opinion concludes that the action would result in vessel strike and behavioral disturbance of northern sea otters. The biological opinion concludes that it expects some mothers with pups would be affected by the action if they are unable

to leave the area or acclimate, and therefore experience increased and repeated stress. It also concludes that the action would result in impacts on habitat that would affect sea otters.

168.    The biological opinion concludes that the action is not likely to jeopardize the continued existence of the southwest Alaska DPS of northern sea otters. The jeopardy analysis is entirely conclusory.

169.    The biological opinion's jeopardy analysis does not add the effects of the road on northern sea otters to the environmental baseline, cumulative effects, and all other activities and influences that affect the status of the species, including climate change and development outside of Izembek.

170.    The biological opinion does not include an incidental take statement for the southwest Alaska DPS of northern sea otters and concludes that one is not required.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Violations of the Alaska National Interest Lands Conservation Act,
### 16 U.S.C. § 3120, under the Administrative Procedure Act, 5 U.S.C. § 706
(Brought against the Service in its capacity as the action agency)

171.    Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1-170.

172.    ANILCA section 810 requires the Federal Defendants to evaluate the effects of the land exchange and road on subsistence uses and needs, including downstream and cumulative impacts; consider the availability of other lands for the

purposes sought to be achieved; and assess alternatives to reduce or eliminate the use, occupancy, or disposal of public lands needed for subsistence. 16 U.S.C. § 3120(a). This initial evaluation leads to either a finding of significant restriction or a finding of no significant restriction of subsistence uses. *Id*.

173. Federal Defendants' decision to exchange lands in the Izembek Refuge to KCC to build a road will restrict Native Villages' citizens' subsistence uses and needs. Migratory waterfowl that rely on the Izembek Refuge, including Pacific black brant, emperor geese, and cackling geese, provide crucial subsistence, cultural, and traditional resources for the citizens of Native Villages. Harm to these migratory birds in the Izembek Refuge will impair Native Villages' citizens' subsistence uses of the birds. The Service was therefore required to include an 810 evaluation and significant restriction finding for Native Villages' citizens' subsistence uses in the ANILCA section 810 analysis.

174. If a proposed action may significantly restrict subsistence uses, the agency cannot proceed unless it provides notice to affected communities, holds hearings in the vicinity of affected communities, and makes several affirmative determinations. 16 U.S.C. § 3120(a). The required determinations are that "such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands"; "the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition;" and "reasonable steps will be taken to minimize adverse impacts on

subsistence uses and resources resulting from such actions." 16 U.S.C. § 3120(a).

175. The land exchange and road will significantly restrict the subsistence uses and needs of Native Village citizens. Scientists have concluded that the primary and secondary effects of a road through Izembek would have long-lasting population-level impacts on migratory birds, including black brant, emperor geese, and cackling geese. Because these birds are a crucial subsistence resource for Native Villages, a reduction in numbers of these birds would lead to a significant restriction in their ability to harvest them.

176. The Service's analysis of effects on Native Villages is inadequate and does not comply with ANILCA section 810. 16 U.S.C. § 3120(a). In purporting to evaluate the effects of the land exchange on Native Villages' subsistence uses and needs, the Service applied an overly restrictive framework for significant restrictions. It ignored Native Villages' own assessments of the critical importance of the geese, evidenced by decades of work to protect them, and instead substituted in irrelevant and unreliable figures and percentages. In its section 810 analysis, the Service also drew conclusions about the effects of the action on Native Villages that were not supported by the information before the agency, in some cases contradicting its own findings of additional road impacts in the biological opinion. The Service also failed to assess alternatives to reduce or eliminate the use, occupancy, or disposal of public lands needed for subsistence. The Service's inadequate consideration of impacts led it to conclude that there would be no significant restriction of subsistence uses for Native Villages.

177.     A lawful ANILCA section 810 analysis would have found a significant restriction of subsistence uses and needs for Native Villages. The Service was therefore required to meet the additional requirements of ANILCA section 810 for Native Villages. 16 U.S.C. § 3120(a).

178.     The Service did not hold hearings in the vicinity of Native Villages. For Native Villages, the Service did not determine whether (1) "such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands"; (2) "the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition"; or (3) "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions." 16 U.S.C. § 3120(a)(1)–(3).

179.     The Exchange Agreement and decision document are final agency actions within the meaning of the APA.

180.     The Secretary's decision to authorize the Exchange Agreement based on an unlawful ANILCA section 810 evaluation and without meeting section 810's additional requirements, 16 U.S.C. § 3120(a), is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706.

181.     As a result of Federal Defendants' failure to comply with ANILCA section 810, the ANILCA section 810 analysis, Exchange Agreement, decision document, patent,

warranty deed acceptance, and other implementing actions are unlawful and should be vacated.

**Second Claim for Relief**
**Violations of the Alaska National Interest Lands Conservation Act,**
**16 U.S.C. §§ 3161–3173, under the Administrative Procedure Act, 5 U.S.C. § 706**
(Brought against the Service in its capacity as the action agency)

182.    Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1-170.

183.    ANILCA Title XI provides a "single comprehensive statutory authority" for approving or disapproving transportation systems through conservation system units, including national wildlife refuges, in Alaska. 16 U.S.C. § 3161(c).

184.    ANILCA Title XI's requirements include, among other things, compliance with specific timelines, public involvement, the preparation of an EIS, and eight detailed findings. 16 U.S.C. § 3164.

185.    ANILCA Title XI prohibits the authorization of transportation systems through designated wilderness unless they have been recommended by the President and approved by Congress. 16 U.S.C. § 3166.

186.    The purpose of the Exchange Agreement is to create a transportation system through the Izembek Refuge.

187.    Federal Defendants did not comply with the mandates of ANILCA Title XI.

188.    The Exchange Agreement was not adopted pursuant to Title XI's procedures.

189. BLM issued the patent from the United States to KCC in violation of Title XI's procedures.

190. The Service accepted the warranty deed in violation of Title XI's procedures.

191. The President has not recommended to Congress that a road be constructed through Izembek pursuant to Title XI's procedures.

192. Congress has not approved a road through Izembek pursuant to Title XI's procedures.

193. ANILCA § 1302(h), 16 U.S.C. § 3192(h), does not exempt the Exchange Agreement from Title XI's requirements.

194. The Exchange Agreement and decision document are final agency actions within the meaning of the APA.

195. Federal Defendants' decision to exchange Izembek lands for KCC lands for the purpose of facilitating the construction of a road through the Izembek Refuge without complying with ANILCA Title XI is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, without observance of procedure required by law, or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706.

196. ANILCA Title XI mandates that any action "by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall not have any force or effect unless

the provisions of this section are complied with," thus the Exchange Agreement, decision document, patent, warranty deed acceptance, and other implementing actions are null and void. 16 U.S.C. § 3164(a).

**Third Claim for Relief**
**Violations of the Alaska National Interest Lands Conservation Act,**
**16 U.S.C. § 3192(h), under the Administrative Procedure Act, 5 U.S.C. § 706**
(Brought against the Service in its capacity as the action agency)

197.   Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1-170.

198.   Under ANILCA section 1302(h), the Secretary may only acquire lands via exchange if it is for the purposes of ANILCA. 16 U.S.C. § 3192(h).

199.   Congress expressed two purposes of ANILCA. The first is conservation: to preserve natural landscapes; maintain sound populations and habitat for wildlife; preserve ecosystems in their natural state; protect historic sites; preserve wilderness values and recreational opportunities; and maintain opportunities for scientific research and undisturbed ecosystems. 16 U.S.C. § 3101(b). The second is subsistence: to provide the opportunity for rural residents engaged in a subsistence way of life to continue doing so. *Id.* § 3101(c).

200.   The primary purpose of the exchange is to remove lands from the Izembek Refuge for a road, not to acquire lands for conservation and subsistence purposes.

201.   The Exchange Agreement does not further the purposes of ANILCA.

202.   Even if ANILCA contained the additional purposes Federal Defendants

claim, the Exchange Agreement still would not further the purposes of ANILCA.

203.    The Exchange Agreement and decision document are final agency actions within the meaning of the APA.

204.    Federal Defendants' decision to exchange Izembek Refuge lands for KCC lands to facilitate the construction of a road through the Izembek Refuge when it does not further the purposes of ANILCA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, without observance of procedure required by law, or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706.

205.    As a result of Federal Defendants' failure to comply with ANILCA section 1302(h), the Exchange Agreement, decision document, patent, warranty deed acceptance, and other implementing actions are unlawful and should be vacated.

**Fourth Claim for Relief**
**Violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m,**
**under the Administrative Procedure Act, 5 U.S.C. § 706**
(Brought against the Service in its capacity as the action agency)

206.    Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1-170.

207.    NEPA requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

208.    The Exchange Agreement for the purpose of facilitating a road through the

Izembek Refuge is a major federal action significantly affecting the quality of the human environment.

209. Federal Defendants did not complete an EIS or otherwise comply with NEPA's mandates before the Secretary authorized the Exchange Agreement and finalized the patent, warranty deed acceptance, and other implementing actions for the purpose of facilitating a road through the Izembek Refuge.

210. The Exchange Agreement and decision document are final agency actions within the meaning of the APA.

211. Federal Defendants' decision to exchange lands for the purpose of building a road through the Izembek Refuge without complying with NEPA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

212. As a result of Federal Defendants' failure to comply with NEPA, the Exchange Agreement, decision document, patent, warranty deed acceptance, and other implementing actions are unlawful and should be vacated.

### Fifth Claim for Relief
### Violations of the Endangered Species Act, 16 U.S.C. § 1536, under the Administrative Procedure Act, 5 U.S.C. § 706
(Brought against the Service in its capacity as the wildlife agency)

213. Plaintiffs incorporate and adopt by reference each of the allegations in paragraphs 1-170.

214. In completing a biological opinion and making its jeopardy determination

pursuant to section 7(a)(2) of the ESA, the Service, in its capacity as the wildlife agency, must consider whether the aggregate effects of the factors considered in the environmental baseline, effects of the action, and cumulative effects, when viewed against the status of the species, are likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g). A biological opinion must include an incidental take statement for any take that is reasonably certain to occur from the action. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (i).

215.   The Service's biological opinion is a final agency action within the meaning of the APA.

216.   The Service's biological opinion fails to include an incidental take statement that would account for, minimize, require the reporting of, and authorize take of Alaska-breeding Steller's eiders and the southwest Alaska DPS of northern sea otter in accordance with the ESA, despite finding that the road facilitated by the land exchange will lead to disturbance, injury, and death of both listed species.

217.   The Service's biological opinion fails to employ the proper jeopardy analysis for Alaska-breeding Steller's eiders and the southwest Alaska DPS of northern sea otter for at least the following reasons:

    a.   Improperly concluding that increased disturbances from construction and use of the road, when aggregated with other effects of the road, will not have an appreciable impact on either species, including their reproductive success, productivity, and distribution; and

b. Improperly considering only the isolated share of responsibility for impacts from construction and use of the road, rather than adding the direct and indirect effects of the road to all other activities and influences that affect the species, including effects from climate change and development outside of Izembek.

218. The Service's determinations in the biological opinion that the land exchange will not jeopardize the continued existence of Alaska-breeding Steller's eiders or the southwest Alaska DPS of northern sea otters are improper, have no factual and analytical basis in the biological opinion, are not rationally connected to the facts found in the biological opinion, and are not based on the best available scientific data.

219. The Service's biological opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA, in violation of the APA. 5 U.S.C. § 706(2)(A).

220. As a result of the Service's failure to comply with the ESA, the Service's biological opinion is unlawful and should be vacated.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A. Declare that the Exchange Agreement, decision document, and any appraisals, patents, and warranty deeds that implement Federal Defendants' exchange of Izembek Refuge lands for KCC lands are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with ANILCA and NEPA; made without observance of

procedures required by ANICLA and NEPA; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right—in violation of ANILCA, NEPA, and the APA;

B.      Declare that the ANILCA 810 analysis is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law, in violation of ANILCA and the APA.

C.      Declare that the Service's biological opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of the ESA and APA;

D.      Invalidate, vacate, and set aside the Exchange Agreement, decision document, and any associated appraisals, patents, and warranty deeds for failing to comply with ANILCA, NEPA, and the APA;

E.      Invalidate, vacate and set aside the ANILCA 810 analysis for failing to comply with ANILCA and the APA;

F.      Invalidate, vacate, and set aside the Service's biological opinion for failing to comply with the ESA and the APA;

G.      Enter appropriate injunctive relief to prevent irreparable harm to Plaintiffs and the environment until such compliance occurs;

H.      Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

I.      Grant such other relief as this Court deems just and proper.

Dated: November 12, 2025        Respectfully Submitted,

_ s/ Marlee Goska_
Marlee Goska (Alaska Bar No. 2305043)
CENTER FOR BIOLOGICAL DIVERSITY

_ s/ Rebecca Noblin_
Rebecca Noblin (Alaska Bar No. 0611080)
CENTER FOR BIOLOGICAL DIVERSITY

_Attorneys for Plaintiffs_